CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

May 07, 2025
LAURA A. AUSTIN, CLERK
BY  s/ S. MELVIN
   DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| **360 PAINTING, LLC,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JAMES GILLIAM** | ) |
| | **)** |
| Serve: James Gilliam | ) |
| 814 Eastcliff Dr. | ) |
| Eules, Texas, USA 76040 | ) |
| | ) |
| **BRIDGEJAM, LLC** | ) |
| | ) |
| Serve: James Gilliam | ) |
| 814 Eastcliff Dr. | ) |
| Eules, Texas, USA 76040 | ) |
| | ) |
| | ) |
| **NOMAD CONTRACTORS LLC** | ) |
| **d/b/a NOMAD COATINGS** | ) |
| | ) |
| Serve: Kristina Chshelokovskiy | ) |
| 3261 Birch Ave | ) |
| Grapevine, TX 76051 | ) |
| | ) |
| *Defendants.* | ) |

Civil Case No.  3:25-cv-33

## COMPLAINT

Plaintiff 360 Painting, LLC ("360 Painting") by and through its attorneys, brings this Complaint against Defendant James Gilliam ("Gilliam"), BridgeJam, LLC ("BridgeJam") and Nomad Contractors, d/b/a Nomad Coatings ("Nomad" and, collectively with Gilliam and BridgeJam, the "Defendants"). In support thereof, 360 Painting states as follows:

1

## INTRODUCTION

1.    This suit stems from Gilliam's multiple and continuing breaches of the Franchise Agreement entered into by 360 Painting and Gilliam on or about November 16, 2021 (the "Franchise Agreement") including without limitation Gilliam's breach of the covenants not to compete and his misappropriation of 360 Painting's confidential and trade secret information.[1]

2.    The parties executed the Franchise Agreement for a ten (10) year term, beginning on November 16, 2021, and ending on November 15, 2031. Under the terms of the Franchise Agreement, 360 Painting licensed its painting business system, including the provision of various associated services and property, to Gilliam in return for royalties and other services fees, as well as the Gilliam's commitment not to compete with 360 Painting and to maintain the confidentiality of any confidential and/or trade secret information he received from 360 Painting, among other binding obligations.

3.    Shortly after executing the Franchise Agreement, Gilliam assigned his rights and obligations thereunder to BridgeJam, a company he served as president and over which Gilliam maintained control during all periods relevant to this Complaint.

4.    After approximately two and a half years, Gilliam, through BridgeJam, expressed his desire to terminate the Franchise Agreement, citing declining revenue attributable to his painting franchise. After negotiation, BridgeJam, and 360 Painting entered into a Fee Waiver Agreement, as well as a Surrender of Rights and Mutual Release which became effective on July 19, 2024. Under the Fee Waiver Agreement, 360 Painting agreed to waive certain fees for a defined period to permit Gilliam and BridgeJam an opportunity to identify a purchaser for the franchise and assigned territory their 360 Painting franchise previously covered. When the franchisees

---

[1] A true and accurate copy of the Agreement is attached as Exhibit A.

proved unable to find a buyer over the next six (6) months, they executed the Surrender of Rights and Mutual Release in December 2024.

5.      During the period leading up to the Fee Waiver and after, Gilliam and BridgeJam misrepresented the franchise's earnings to 360 Painting to induce 360 Painting into accepting a termination and release which would permit Gilliam and BridgeJam to to fund and capitalize a competing venture, Nomad Coatings. Defendant sought to use 360 Painting's sympathy for his failing business as a launching pad for another painting enterprise that he intended to operate in express violation of the provisions of his Franchise Agreement. On information and belief, Gilliam has misappropriated 360 Painting's confidential and/or trade secret information for use in Nomad.

6.      360 Painting seeks compensation for the damages resulting from Gilliam's and Bridgejam's breaches of the Franchise Agreement, as well as their misappropriation of 360 Painting's confidential and trade-secret information. 360 Painting also seeks compensation for the fraudulent scheme Gilliam and BridgeJam enacted to induce 360 Painting to execute the Fee Waiver Agreement and the Surrender of Rights and Mutual Release. Finally, 360 Painting seeks redress for the lost revenue suffered as a result of underreporting of gross franchise sales orchestrated by Gilliam and BridgeJam during the term of the Franchise Agreement.

## PARTIES

7.      Plaintiff 360 Painting, LLC is a Delaware limited liability company authorized to transact business in the Commonwealth of Virginia with its principal place of business in Charlottesville, Virginia. 360 Painting franchises its established system for interior and exterior painting services, to include equipment, tools, materials, methods, procedures, quality standards, client lists, leads, and service marks to its national network of franchisees.

8.      Defendant James Gilliam is, on information and belief, a Texas resident and citizen and may be served with process at 814 Eastcliff Dr., Eules, Texas 76040. Defendant previously entered into a Franchise Agreement with 360 Painting to license its painting business system.

9.      Defendant BridgeJam, LLC is a Texas limited liability company with its principal place of business in Eules, Texas. BridgeJam became a party to the Franchise Agreement with 360 Painting to license its painting business system.

10.     Defendant Nomad Contractors, LLC d/b/a Nomad Coatings ("Nomad") is a Texas limited liability company with its principal place of business in Austin, Texas. Nomad was formed on September 7, 2018, and registered the trade name "Nomad Coatings" on October 15, 2024. On information and belief, James Gilliam is an owner and/or operator of Nomad and has held that position at all times relevant to the facts alleged in this Complaint.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the subject and parties pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interests and costs, and there is complete diversity of citizenship between the Plaintiff and Defendants.

12.     This Court has supplemental jurisdiction over 360 Painting's state law claims under 28 U.S.C. § 1367(a) because those claims are so related to the claims in this action over which the Court has original jurisdiction that the claims are part of the same case or controversy.

13.     Venue is proper in this Court, and the Court has personal jurisdiction over Gilliam and BridgeJam because both consented to this Court's jurisdiction and venue in this Court under the terms of the Franchise Agreement:

**27.2. Consent to Jurisdiction and Venue for Disputes.** Any action brought by either party shall be brought in the appropriate state or federal court located in or

serving county and state in which Franchisor maintains its principal place of business at the time any dispute resolution proceeding is commenced by either party (currently the City of Charlottesville, VA). The parties waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision. The parties hereby submit to service of process by registered and return receipt requested, or by any other manner provided by law. This exclusive choice of jurisdiction and venue provision shall not restrict the ability of the parties to confirm or enforce judgments in any appropriate jurisdiction. This Agreement was executed and accepted at Franchisor's current place of business in the City of Charlottesville, VA. The parties anticipate that the performance of certain of Franchisee's obligations arising under this Agreement, including the payment of certain monies due Franchisor, will initially occur in the City of Charlottesville, VA."[2]

## FACTUAL BACKGROUND

14.    360 Painting operates a nationwide franchising network for licensing its established business system for residential interior and exterior painting services, including equipment, tools, materials, methods, procedures, quality standards, client lists, leads, and service marks to individuals and entities interested in purchasing the business system to streamline the growth of a painting business under the nationally prominent 360 Painting brand.

15.    On or about November 16, 2021, Gilliam and 360 Painting entered into the Franchise Agreement. Like hundreds of other 360 Painting franchisees, Gilliam's rights and obligations under the franchise relationship were set forth in detail by the Franchise Agreement.

16.    The Franchise Agreement, including its exhibits, was signed by Gilliam, in his individual capacity, and 360 Painting, LLC's authorized representative.[3] Gilliam individually guaranteed "that Franchisee shall punctually pay and perform each and every undertaking, condition, and covenant set forth in the Franchise Agreement."[4]

17.    Shortly after signing the Agreement, Gilliam and 360 Painting executed an Assignment Agreement, transferring Gilliam's rights and obligations under the Franchise

---

[2] Exhibit A § 27.2
[3] *See* Exhibit A, pp. 46, 51, 52, 55, 58, 59, 62, 63, 65, and 66.
[4] *Id.* at p. 60

Agreement to Gilliam's company, BridgeJam, LLC.[5] Under the Assignment Agreement BridgeJam "expressly assume[d] all of the terms, covenants and conditions under the terms of the Franchise Agreement, and expressly agree[d] to be bound thereby and assumes full performance thereunder."[6]

18.     Similarly, Gilliam agreed to "unconditionally guaranty the performance of [BridgeJam] of all the terms, covenants, and conditions of the Franchise Agreement."

19.     Upon signing the Franchise Agreement, Gilliam established his 360 Painting franchise in the Arlington, Texas area, within the territory designated by the Franchise Agreement and operated, either on his own or through his holding company and co-franchisee, BridgeJam, for a little over three (3) years.

20.     In July 2024, after reporting comparably low franchise sales over the preceding quarters, Gilliam approached 360 Painting to request a waiver or reduction in the amount of the fees BridgeJam owed under the Franchise Agreement. Based on the consistently low reported revenue of the Gilliam/BridgeJam franchise, 360 Painting agreed. The parties subsequently entered into the Fee Waiver Agreement and, eventually, a Surrender and Mutual Release Agreement.[7]

21.     The only reason 360 Painting agreed to the Fee Waiver Agreement and the Surrender and Mutual Release Agreement was because of the false representations made by BridgeJam and Gilliam concerning the dire financial situation faced by their business. The representations were material to 360 Painting because higher revenue figures would have caused 360 Painting to explore other alternatives for boosting sales before agreeing to a prospective sale, then a termination. A failed franchise is one of the worst business outcomes for 360 Painting that

---

[5] *See* Exhibit B, Assignment of Franchise Agreement.
[6] Exhibit B, § 2.
[7] A Copy of the Fee Waiver Agreement is attached as Exhibit C hereto. A copy of the Surrender and Mutual Release Agreement is attached as Exhibit D hereto.

the company would have sought to avoid if more promising revenue had been reported accurately by Gilliam and/or BridgeJam.

22.    Under the Fee Waiver Agreement, 360 Painting "waives the accrual and collection of minimum fees due for Royalties, Marketing Fund Contributions, Contact Center Fees, and recurring Technology Fees otherwise due under the Franchise Agreement from July 12, 2024 to October 10, 2024."[8] In the event that Gilliam and BridgeJam were unable to sell or transfer the franchise during the fee waiver period, 360 Painting agreed that the Surrender and Mutual Release Agreement would go into effect. The Surrender and Mutual Release Agreement allowed Gilliam and BridgeJam to surrender their rights under the Franchise Agreement and close their 360 Painting franchise.

23.    In early 2025, 360 Painting discovered that Gilliam was making public appearances as a representative for a company called Nomad Coatings, a business offering both commercial and residential painting and finishing services.

24.    Nomad directly competes with 360 Painting. Nomad operates in the same market and pursues the same customers as 360 Painting, which are homeowners and business owners located in the greater Dallas metro area.

25.    The Franchise Agreement forbids unfair and unlawful competition from current or former franchisees under circumstances like the ones Gilliam and BridgeJam created. Specifically, the Franchise Agreement signed contained various covenants not to compete which applied during the term of the Agreement and for two (2) years following its termination. These sections, to which Gilliam and BridgeJam agreed, state:

---

[8] Exhibit C, § 1.

**18.1. Covenants Not to Compete.**

(i)      *Non-Competition during Term.* In addition to and not in limitation of any other restrictions on Franchisee contained herein, Franchisee and Franchisee's spouse, and, if Franchisee is not an individual, its shareholders, members, partners and managers, as applicable, and their spouses (each, a "Bound Party"), agree that they will not, during the term of this Agreement, directly or indirectly, for and on behalf of itself, himself, herself or any other person or entity, during the term of this Agreement, (a) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business (as defined below) or (b) perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business which is located (i) within the Protected Territory, or (ii) within a radius of twenty (20) miles as the crow flies of the Protected Territory, or (iv) within a radius of twenty (20) miles as the crow flies of any other 360 Painting Business or 360 Painting Business in development that has been assigned a protected; or (v) within the United States of America; or (vi) within the world.

(ii)     *Post-Term Non-Competition.* In addition to and not in limitation of any other restrictions on Franchisee contained herein, Franchisee and the Bound Parties agree that they will not, for two (2) years following the effective date of termination or expiration of this Agreement for any reason, or following the date of a Transfer by Franchisee, directly or indirectly, for and on behalf of itself, himself, herself or any other person or entity, (a) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business or (b) perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business which is (i) located or operating within the Protected Territory; or (ii) within a radius of twenty (20) miles as the crow flies of the Protected Territory or (iii) located in or operating within twenty (20) miles of the primary office of any other existing  360 Painting Business or 360 Painting Business in development that has been assigned a protected territory.[9]

26.      These provisions of the Franchise Agreement restricted the franchisees' ability to acquire or hold a beneficial interest in a "Competitive Business" or to perform any work for a "Competitive Business" located within twenty (20) miles of Gilliam/BridgeJam's franchise or any other 360 Painting business (or business in development) with a protected territory.[10] During the term of the Franchise Agreement, Gilliam and BridgeJam also agreed not to perform work for a "Competitive Business" in the United States or anywhere in the world.[11]

---

[9] Ex. A, §18.1.
[10] Ex. A, §18.1(i).
[11] Ex. A, §18.1(i).

27.    Although the Franchise Agreement was assigned to BridgeJam, Gilliam remained bound by it: under the Franchise Agreement, he was a "Bound Party" who guaranteed the obligations of BridgeJam.[12] As the sole member of BridgeJam, and its manager, Gilliam remained a Bound Party during and after the termination of the Franchise Agreement, which rendered him subject to the Franchise Agreement's non-compete covenants be pre- and post-termination.

28.    These covenants not to compete were binding and survived the termination of the Franchise Agreement. Gilliam and BridgeJam were also aware of this fact because the Surrender and Mutual Release Agreement reiterated that the covenants would persist. Specifically, the document stated that BridgeJam (the Franchisee) and Gilliam (the Guarantor) were agreeing to "strictly comply with the noncompetition and confidentiality terms and conditions of the Franchise Agreement."[13]

29.    The Franchise Agreement defines a "Competitive Business" as one that operates "in any business which offers or sells painting, decorating and wall finishing services."[14] In short, by signing the Agreement, Defendant agreed not to work for companies (whether owned by him or otherwise) that offer services similar to, or the same as, the services offered by 360 Painting franchisees.

30.    Nomad is a "Competitive Business" under the definition used in the Franchise Agreement. Nomad markets itself as "delivering customized painting solutions that meet the unique requirements of every project" and uses media on its website from past painting projects to attract potential painting customers. Nomad's public-facing website makes clear that Nomad is

---

[12] Ex. A, §18.1(i).
[13] Ex. D, §7 (xii).
[14] Ex. A, §18.1(iii).

engaged in the same business as 360 Painting, which is the provision of painting, decorating, and wall finishing services to commercial and residential consumers.

31.    Gilliam has performed work for and on behalf of Nomad. Gilliam is sufficiently enmeshed in Nomad's operations to be listed as the primary contact for Nomad in a professional services directory used to advertise Nomad's painting services to the public on Nomad's website. On information and belief, Gilliam possesses an ownership or membership interest in Nomad which would constitute a separate and independent breach of §18.1(ii)(a) of the Franchise Agreement.

32.    The Franchise Agreement also restricts Gilliam's ability to solicit customers and vendors of his 360 Painting franchise during and after the agreement term:

> …for two (2) years after expiration or termination of this Agreement for any reason…[the Franchisee and the Bound Parties] will not directly solicit or otherwise materially interfere with or disrupt the customer or vendor relationship between [360 Painting] and any of their respective customers and vendors or between any other 360 Painting franchisee and its customers and vendors."[15]

33.    On information and belief, Gilliam has, either directly or through Nomad, solicited 360 Painting's customers and potential customers. Gilliam's breach of the non-solicitation terms of the Franchise Agreement has been particularly damaging to 360 Painting because, as the Franchise Agreement explains, the franchisee's (and the Bound Parties') experience with the franchise business system will necessarily result in his "knowledge of Franchisor's business and operating methods and confidential information, disclosure and use of which would prejudice the interest of Franchisor and its franchisees."[16] By executing the Franchise Agreement and becoming a franchisee, Gilliam gained access to 360 Painting's confidential, proprietary, and trade-secret information, including, without limitation, its pricing strategy, distribution network, marketing

---

[15] Exhibit A §18.2
[16] Exhibit A §18.1(iv).

strategy and customer list(s) and marketing channels, as well as equipment, tools, materials, methods, procedures, quality standards, and service marks provided by 360 Painting to its national network of franchisees.

34.    360 Painting can only distribute its proprietary, confidential, and trade secret information under contract terms which preserve its competitive value in the residential services market. In exchange for access to 360 Painting's highly confidential, proprietary, and trade secret information Gilliam believed would benefit his nascent painting business, Gilliam and BridgeJam agreed to preserve 360 Painting's confidential and trade secret information and to not "directly or indirectly, disclose or publish to any party or copy or us for such party's own benefit, or for the benefit of any other party, any of Franchisor's proprietary or confidential information."[17] As noted above, even after the assignment of the Franchise Agreement to BridgeJam, Gilliam was individually bound by these covenants as a "Bound Party."

35.    The confidentiality provisions were, likewise, not included among the releases in the Surrender and Mutual Release Agreement:

> "Franchisee and Guarantor…will satisfy all of their obligations under the Franchise Agreement that by their express terms survive expiration or termination of the Franchise Agreement, including but not limited to obligations regarding **confidentiality, noncompetition**…and more specifically the post-expiration obligations contained in Sections 18 and 20 of the Franchise Agreement"[18]

36.    On information and belief, Gilliam has materially breached § 18.3 of the Franchise Agreement by using 360 Painting's confidential, proprietary, and trade secret information to benefit himself and a Competitive Business—Nomad—as it seeks to expand its market share within the Protected Territory promised to Gilliam and BridgeJam by 360 Painting.

---

[17] Ex. A, § 18.3. (Defendant's obligations under the Confidentiality provisions of the Agreement last throughout the term of the Agreement and for five (5) years thereafter for confidential information and, for trade secret information, until such time as that information is no longer a "trade secret").
[18] Ex. D, §7 (*emphasis added*)

37.     Gilliam's employment and association with Nomad is a material breach of the Franchise Agreement. Similarly, Gilliam's use of 360 Painting's confidential, proprietary, and trade secret information to refine the Nomad business and expand its competitive reach against 360 Painting is an independent material breach of the Franchise Agreement. 360 Painting is entitled to an injunction against Gilliam for this type of material breach per the Franchise Agreement.[19] Under the plain terms of the Franchise Agreement, 360 Painting is entitled to an injunction prohibiting Gilliam and Nomad from engaging in unfair competition against 360 Painting.

38.     On information and belief, Gilliam and BridgeJam submitted improper accounting for their franchise, which diminished the fees they owed to 360 Painting under the Franchise Agreement and fraudulently induced 360 Painting to enter into both the Fee Waiver Agreement and the Surrender and Mutual Release Agreement. Further, on information and belief, amounts owed to 360 Painting were instead funneled into Nomad to support an enterprise built on a foundation of dishonesty, unfair competition, and trade secret misappropriation. 360 Painting is entitled to recission of these agreements and to damages in the amount of the fees it would have earned had Gilliam and BridgeJam accurately reported the franchise's income. By ordering recission of the Surrender and Mutual Release Agreement, 360 Painting is also entitled, under § 6.4 of the Franchise Agreement, to perform an audit of BridgeJam's records to determine the exact amount by which Gilliam and BridgeJam underreported the income and calculate its owed fees.

39.     Furthermore, 360 Painting is entitled to amounts it should have received from Gilliam and BridgeJam under the Franchise Agreement post-termination as if the Franchise

---

[19] Ex. A, §18.3.

Agreement's termination had not occurred on materially fraudulent grounds. Under the Franchise Agreement, Gilliam and BridgeJam owed 360 Painting contractual minimum payments of $150.00 per week in royalties and $375.00 per week in services fees. Absent Gilliam and BridgeJam's material misrepresentations to induce its termination, the Franchise Agreement's initial ten-year term would have run from November 16, 2021, through November 15, 2031, a period of 3,652 days. The Surrender and Mutual Release Agreement became effective on or around December 15, 2024, which was approximately 360 weeks prior to the initial term expiration. The minimum fees due to 360 Painting under the Franchise Agreement are thus $150.00 per week * 360 weeks = $54,000.00 in royalties and $375.00 per week * 360 weeks = $135,000.00 for service/technology fees. The total damages arising from the Gilliam and BridgeJam's failure to pay contractually due minimum royalties, technology fees, and contact center fees is thus $54,000 + $135,000 = $189,000.00 or more.

40.     360 Painting also seeks relief for Gilliam's breach of the non-compete covenants of the Franchise Agreement and the unauthorized conversion and/or disclosure of the confidential, proprietary, and trade secret information provided to Gilliam as part of the 360 Painting business system. In addition to special damages, 360 Painting requests that this Court issue an injunction against Gilliam barring him from further employment and/or association with Nomad, as well as ordering the disgorgement of any ownership or membership interest in Nomad by Gilliam and repayment of any profits or remuneration he received as consideration for work performed for Nomad in violation of the Franchise Agreement.

## COUNT I

## BREACH OF THE FRANCHISE AGREEMENT
### (against Gilliam and BridgeJam)

41.     Paragraphs 1-40 are re-alleged and incorporated herein by reference.

42.     360 Painting, Gilliam and BridgeJam entered into a legally binding franchise agreement. 360 Painting has performed all of its obligations and provided all services and performance required of it under the Franchise Agreement and both Gilliam and BridgeJam have accepted 360 Painting's performance without objection.

43.     After Assignment of the Franchise Agreement to BridgeJam, Gilliam remained bound by the non-competition and confidentiality provisions by virtue of his being a "Bound Party" as defined in the Franchise Agreement. As the Guarantor, he was likewise responsible for ensuring that BridgeJam abided by the terms of the Franchise Agreement.

44.     BridgeJam has breached the Franchise Agreement by failing to adhere to its obligations under §§ 6.1; 6.2; and 6.3. Specifically, BridgeJam has violated its obligations to maintain appropriate accounting and business records by providing 360 Painting with intentionally inaccurate financial and operations reports. Gilliam, as BridgeJam's operator and manager and the Guarantor under the Franchise Agreement and Assignment Agreement, is liable for BridgeJam's breaches of the Franchise Agreement.

45.     Gilliam has breached the Franchise Agreement by failing to adhere to his obligations under §§ 18.1(i); 18.1(ii), 18.2, and 18.3. Specifically, Gilliam has violated his covenant not to engage in a competing business both during the term of the Agreement and for two (2) years thereafter and has failed to maintain the confidentiality of 360 Painting's confidential and trade-secret information.

46.     The foregoing obligations under §§ 18.1(i); 18.1(ii), 18.2, and 18.3 of the Franchise Agreement were restated and reaffirmed by the parties in the context of the Surrender and Mutual

14

Release Agreement. As of December 2024, when the Surrender and Mutual Release Agreement was signed, Gilliam remained subject to these provisions of the Franchise Agreement.

47.     360 Painting has suffered special damages from BridgeJam and Gilliam's material breaches of the Franchise Agreement and has been damaged in an amount no less than $189,000.00. Further, 360 Painting has suffered special damages in an amount equivalent to the fees that would have been owed to 360 Painting had BridgeJam accurately reported its financial and accounting records. 360 Painting is further entitled to an injunction enjoining Gilliam and BridgeJam from further employment and/or association with Nomad, or any Competing Business, for the duration of the term of Gilliam and BridgeJam's covenant not to compete contained in § 18 of the Franchise Agreement.

48.     360 Painting is also entitled to disgorgement of any and all compensation received by Gilliam from Nomad as a result of Gilliam and BridgeJam's breach of their confidentiality obligations and the use of 360 Painting's confidential and proprietary information in establishing and running Nomad. 360 Painting is also entitled to the issuance of an injunction restricting Gilliam's use of that confidential and trade secret information, as well as an Order mandating that Gilliam and BridgeJam destroy any of 360 Painting's confidential and/or trade secret information that remains in their possession.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE VIRGINIA UNIFORM TRADE SECRETS ACT (Va. Code §59.1-336 *et seq.*)
(against Gilliam and Nomad)

49.     Paragraphs 1-48 are re-alleged and incorporated herein by reference

50.     Va. Code § 59.1-336 defines a trade secret as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from it disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[20]

51.    360 Painting owns trade secrets as defined in Va. Code §59.1.-336. The painting services system and associated materials, equipment, and strategy developed by 360 Painting constitute trade secrets because they are not generally known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

52.    360 Painting took reasonable measures to maintain the secrecy of such information and licenses these trade secrets to its franchisees on the condition that they agree to keep the trade secrets confidential.

53.    360 Painting only releases these trade secrets to franchisees once the franchisees have signed a franchise agreement such as the one signed by Gilliam and BridgeJam, which provide explicit rules and regulations surrounding the use of those trade secrets. As noted above, among the covenants to which franchisees agree is a covenant to maintain the confidentiality of 360 Painting's trade secrets in a manner consistent with 360 Painting's own efforts to maintain the confidentiality of those trade secrets. These covenants, and Gilliam's continuing obligations pursuant to them, were explicitly reiterated in the Surrender and Mutual Release Agreement.

54.    Under the Franchise Agreement, 360 Painting provided Gilliam and BridgeJam access to certain confidential, proprietary, and trade secret information in exchange for their commitment to maintain the confidentiality of 360 Painting's trade secrets and confidential information. Specifically, Gilliam agreed not to disclose or utilize 360 Painting's confidential and

---

[20] Va. Code §59.1-336.

trade secret information for purposes other than the operation of a 360 Painting franchise subject to the Franchise Agreement. At the time Gilliam breached the confidentiality and disclosed 360 Painting's trade secrets, Gilliam knew of his contractual duty to maintain its confidentiality and his agreement to refrain from unauthorized uses, which include any other purpose than for operating the licensed franchise subject the Franchise Agreement.

55.     On information and belief, Defendants Gilliam and Nomad have misappropriated 360 Painting's confidential and trade secret information and used it in furtherance of establishing and bolstering a Competing Business, Nomad. The information misappropriated by Defendants Gilliam and Nomad includes, but is not limited to, use of customer lists, pricing and marketing strategies, and 360 Painting's overall proprietary system.

56.     Gilliam and Nomad's misappropriation of 360 Painting's confidential and trade secret was willful and malicious.

57.     As a direct and proximate result of Defendants Gilliam and Nomad misappropriation, 360 Painting has suffered damages and is entitled to disgorgement of all Gilliam's profits derived from the trade secret misappropriation. 360 Painting is further entitled to a disgorgement of all Nomad's profits derived from the trade secret misappropriation. Because Defendants Gilliam and Nomad's misappropriation was willful and malicious, 360 Painting is entitled to punitive damages under Va. Code § 59.1-338 in an amount not to exceed $350,000.

58.     Further, 360 Painting is entitled to an injunction preventing Defendants Gilliam and Nomad from further use or disclosure of 360 Paintings' confidential and trade secret information and an Order from this Court directing Defendants Gilliam and Nomad to destroy any confidential and trade secret information owned by 360 Painting that remains in Gilliam or Nomad's possession.

## COUNT III
## CONVERSION
(against Gilliam and Nomad)

59.     Paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

60.     Under the Franchise Agreement, 360 Painting agreed to provide Defendants Gilliam and BridgeJam with certain of its confidential information, including, without limitation, its customer relationship management system, lead-tracking software, customer leads, pricing strategy, bidding software, and marketing strategy.

61.     Gilliam was aware of the confidential nature of the information with which he was provided by 360 Painting and agreed to maintain the confidentiality of that information and refrain from using it outside of the scope defined in the Agreement (i.e. for purposes other than establishing his and/or BridgeJam's 360 Painting franchise.)

62.     Gilliam and BridgeJam were aware that the confidential information was being provided to them subject to these contractual limitations and that at all times, the confidential information "is the sole and exclusive property of [360 Painting]."[21]

63.     The execution of the Surrender and Mutual Release Agreement specifically stated that these confidentiality obligations survived the termination of the franchise and Gilliam and BridgeJam agreed to continue to abide by these provisions of the Franchise Agreement.

64.     Rather than abide by his obligations under the Franchise Agreement, Gilliam used the confidential information for purposes that violate the express language of the Franchise Agreement, specifically, namely be enriching himself and a competing painting business, Nomad, through unfair competition.

---

[21] Exhibit A §18.3

65.     On information and belief, Nomad knew that the confidential information provided by Gilliam was the property of 360 Painting and yet still used this confidential information it received from Gilliam to establish and grow its business.

66.     Defendants Gilliam and Nomad's use of the confidential information was unjust and was the direct and proximate cause of damages suffered by 360 Painting.

67.     Accordingly, 360 Painting is entitled to an injunction enjoining Gilliam and Nomad from continued use of 360 Painting's confidential information, and an Order that Defendants Gilliam and Nomad destroy any confidential information owned by 360 Painting which remains in their possession.

68.     Furthermore, 360 Painting is entitled to a disgorgement of all profits obtained by Gilliam and Nomad through their use of 360 Painting's confidential information in a competing business. 360 Painting is also entitled to an injunction barring Defendants Gilliam and Nomad from further use of 360 Painting's confidential, proprietary and/or trade secret information.

## COUNT IV
## FRAUDULENT INDUCEMENT
### (against Gilliam and BridgeJam)

69.     The foregoing paragraphs 1 through 68 are re-alleged and incorporated by reference herein.

70.     Under Virginia Law, "the five elements for a claim of fraudulent inducement are: (1) 'false representation,' (2) 'of material fact,' (3) 'which induces the contract,' (4) 'on which the [other party] had a right to rely,' and (5) results in damages."[22]

71.     Here, BridgeJam and Gilliam misrepresented their franchise's income by providing false and inaccurate financial records to 360 Painting. The amount of income produced by a

---

[22] *Nestler v. Scarabelli*, 77 Va. App. 440 (2023).

franchise is material to its continued success as well as the amounts that franchisees owe to 360 Painting under their respective franchise agreements.

72.    360 Painting has a right to rely on the financial records submitted by its franchisees and, in this case, relied on the material and false financial records submitted by Gilliam and BridgeJam in acquiescing to both the Fee Waiver Agreement and the subsequent Surrender and Mutual Release Agreement, by which the Franchise Agreement was terminated (with the aforementioned exceptions of the confidentiality and non-competition provisions).

73.    Had 360 Painting been aware that Gilliam and BridgeJam were underreporting their income, 360 Painting would not have agreed to either the fee waivers or to allow Gilliam and BridgeJam to terminate the Franchise Agreement on the terms that were provided in the Surrender and Mutual Release Agreement.

74.    Gilliam and BridgeJam's misrepresentation of their financial and accounting records was willful and malicious.

75.    360 Painting has suffered damages including, but not limited to, the minimum fees waived for a period of three (3) months under the Fee Waiver Agreement, as well as the fees it would have been owed (minimum or otherwise) based on the actual income of Gilliam and BridgeJam's franchise. 360 Painting is entitled to an Order from this Court allowing an audit of BridgeJam's financial and accounting records to determine the franchise's actual income and thereby calculate the quantum of its damages. Because Defendants Gilliam and BridgeJam's misrepresentations were willful and malicious, 360 Painting is entitled to punitive damages under Va. Code § 59.1-338 in an amount not to exceed $350,000.

76.     360 Painting is further entitled to the recission of the Surrender and Mutual Release Agreement and is entitled to $189,000 as fees that would have been paid had the Franchise Agreement remained in effect.

**COUNT V (alternatively)**
**UNJUST ENRICHMENT**
(against Gilliam and BridgeJam)

77.     The foregoing paragraphs 1 through 76 are realleged and incorporated by reference herein.

78.     If the Franchise Agreement is found to be invalid, void, voidable, modified, or if 360 Painting is otherwise precluded or limited from recovering under Count I, *supra*, 360 Painting alleges in the alternative that Gilliam and BridgeJam would be unjustly enriched if they were allowed to benefit from the services and property conveyed under the Franchise Agreement without paying for the same.

79.     360 Painting conferred a benefit on Gilliam and BridgeJam by providing access to its painting business system, to include its equipment, tools, materials, methods, procedures, quality standards, and service marks, which were provided for Defendant's use between November 16, 2021, and December 15, 2025. These services and property were to be paid by Defendants Gilliam and BridgeJam from revenues relating to the painting franchise. Defendant knew that 360 Painting provided this property and services, the nature and scope of the services and property, and the value of the services and property at the time that they were provided to the Defendant by 360 Painting including a customer relationship management system, lead-tracking software, advertising campaigns, and bidding software.

80.     If Franchise Agreement is found to be invalid, void, voidable, or modified, Defendant would be unjustly enriched by retaining the value of the training, services, and support

provided by 360 Painting, which were provided on Gilliam and BridgeJam's promise to use them solely for establishing a 360 Painting franchise and to pay royalty fees and services fees. Instead, Gilliam used these to establish and grow Nomad, 360 Painting's direct competitor, and has thus been unjustly enriched as a result.

81.     360 Painting has thereby been damaged in an amount not less than $189,000.00 based on foregone royalties and service fees.

## REQUEST FOR INJUNCTIVE RELIEF

82.     Paragraphs 1 through 81 are hereby re-alleged and incorporated herein for reference.

83.     By virtue of the allegations in the Complaint, 360 Painting has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Gilliam and Nomad.

84.     Unless Defendants Gilliam and Nomad are preliminarily enjoined from engaging in additional misconduct, 360 Painting will be irreparably harmed in the home services franchise marketplace by the continued dissemination and devaluation of its confidential and/or trade secret information, which will have immediate and lasting impact on 360 Painting's business, reputation, goodwill, including damages felt by 360 Painting's franchisees.

85.     Gilliam and Nomad's continued misconduct would result in a substantial loss, the amount of which is not ascertainable at present, and future economic loss which is presently incalculable.

86.     360 Painting has no adequate remedy at law for Gilliam and Nomad's misconduct, and Gilliam has contractually agreed in the Franchise Agreement that 360 Painting is entitled to an injunction without bond to restrain Defendant from any actual or threatened breach.[23]

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

1.     Award compensatory damages of not less than $189,000.00, prejudgment interest due under Virginia Code § 8.01-382, and the costs of suit incurred herein, including reasonable attorneys' fees;

2.     Award Plaintiff an amount equivalent to the fees it would otherwise have earned absent Defendants Gilliam and BridgeJam underreporting their gross revenue to 360 Painting;

3.     Award punitive damages not to exceed $350,000 for Defendants Gilliam and Nomad's willful and malicious misappropriation of 360 Painting's trade secrets;

4.     Award punitive damages not to exceed $350,000 for Defendants Gilliam and BridgeJam's willful and malicious false statements to induce 360 Painting to enter into the Fee Waiver Agreement and the Surrender and Mutual Release Agreement;

5.     Enjoin Gilliam from further engaging in a competing business and enforce the terms of the Franchise Agreement's non-compete provisions;

6.     Enjoin the Defendant from further misappropriation of 360 Painting's confidential and/or trade secret information;

7.     Enter an Order requiring Defendants Gilliam and BridgeJam to disgorge any compensation, profits, or other remuneration received from Nomad for work done in violation of

---

[23] Ex. A, § 18.3.

23

the non-compete or as a result of Nomad's use of 360 Painting's confidential and trade-secret information in furtherance of Nomad's business;

8.      Enter an Order requiring Nomad to disgorge any profits it has received as a result of its use of 360 Painting's confidential and trade-secret information in furtherance of its business.

9.      Enter an Order rescinding the Fee Waiver Agreement and the Surrender and Mutual Release Agreement.

10.     Such other and further relief as the Court may deem to be just and proper.

Dated: May 7, 2025                                          Respectfully Submitted,


                                                           **360 Painting, LLC**


                                        By:  _/s/ Evan D. Mayo_
                                             Evan D. Mayo (VSB No. 89383)
                                             Daniel R.O. Long (VSB No. 95873)
                                             Mayo Law Group PLLC
                                             425 Locust Avenue, Suite 201
                                             Charlottesville, Virginia 22902
                                             Telephone:    434.951.2222
                                             Facsimile:    434.951.0666
                                             evan@mayolawgroup.com
                                             daniel@mayolawgroup.com

                                             *Counsel for 360 Painting, LLC*